**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIA MESHEL<br>2845 Narcissus Road<br>Philadelphia, PA 19154<br><br>Plaintiff,<br>v.<br><br>COUNTY OF BUCKS<br>55 East Court Street<br>Doylestown, PA 18901<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br><br><br>CASE NO.: |

**CIVIL ACTION COMPLAINT**

Julia Meshel (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. This action has been initiated by Plaintiff against the County of Bucks (hereinafter referred to as "Defendant") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII - 42 U.S.C. §§ 2000, *et. seq*.), the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101, *et. seq*.), and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff asserts, *inter alia*, that she experienced unlawful workplace discrimination, sexual harassment and retaliation, culminating in her termination from Defendant. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

**JURISDICTION AND VENUE**

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for civil rights violations under Title VII and the ADA. There lies supplemental and/or

ancillary jurisdiction over Plaintiff's state law claims, as they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

5. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing her Charge with the EEOC, and by filing the instant lawsuit under Title VII within 90 days of receiving a right-to-sue letter from the EEOC.

6. Plaintiff has properly exhausted her administrative remedies regarding her PHRA claims by dual filing her Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and by waiting at least one year since the filing before asserting her PHRA claims.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual, with an address as set forth in the caption.

8. Defendant is a County in Pennsylvania that owns and operates the Bucks County Correctional Facility ("BCCF") located at 1730 S Easton Road, Doylestown, PA 18901 where Plaintiff was employed.

9. At all times relevant herein, Defendant acted by and through its agents, servants and/or employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is a female.

12. Plaintiff was hired by Defendant on or about July 22, 2024.

13. At all times during her employment with Defendant, Plaintiff held the position of Corrections Officer.

14. Plaintiff was supervised by Administrative Lieutenant, Kyle Wylie (male, hereinafter "Wylie").

15. Throughout Plaintiff's employment with Defendant, she consistently performed her job well and was not subjected to a history of progressive discipline.

16. From approximately July 2024 through October 2024, Plaintiff was positioned to perform her duties as a corrections officer primarily on one specific block at BCCF.

17. Two of the senior officers almost always assigned to the aforementioned block were Officer, Robert Leopardi (male, hereinafter "Leopardi") and Robert Kubek (male, hereinafter "Kubek"). Both Leopardi and Kubek have worked for Defendant for approximately 20 (twenty) years.

18. Plaintiff later found out that Leopardi was requesting Plaintiff's supervisors to station Plaintiff on his block.

19. Almost immediately after Plaintiff began working with Leopardi and Kubek, they subjected her to ongoing sexual harassment, a hostile work environment, and degradation. By way of example(s) only, listed below are a few specific interactions Plaintiff can recall with Leopardi (although not all inclusive):

a. Leopardi asked Plaintiff for details about her home life, i.e., where she lived and if she had a boyfriend;

b. Leopardi asked Plaintiff for explicit details about her ex-boyfriend and their relations;

c. Leopardi told Plaintiff she needed to "get with an older man;"

d. Leopardi made consistent statements about Plaintiff's appearance, including making comments about how "nice" Plaintiff's body was and comparing Plaintiff to a previous officer who worked for Defendant and stating that Plaintiff's body was "even nicer than hers;"

e. Leopardi told Plaintiff that he got massages with "happy endings" and invited Plaintiff to join him;

f. Leopardi repeatedly asked, almost demanded, that Plaintiff go to a bar or "go out" with him and Kubek so that she could "get with an older man;" and

g. Leopardi, on more than one occasion, physically pressed up against the back of Plaintiff; rubbed Plaintiff's shoulders; and grabbed Plaintiff's waist as she walked by him.

20. In an effort to protect herself, Plaintiff attempted to avoid conversation with Leopardi and Kubek except to act as a cordial co-worker.

21. However, when it became clear to Leopardi that Plaintiff did not wish to engage in flirtatious conversation or entertain his sexually harassing remarks / advances – Leopardi started to exhibit significant hostility towards Plaintiff even more frequently.

22. In or about October 2024, Plaintiff moved apartments and went to a nail salon nearby on one of her days off of work. Plaintiff found out through conversation that the nail technician she went to was married to Kubek.

23. When Plaintiff arrived at work the next day, she casually mentioned that she saw / met Kubek's wife when Leopardi asked Plaintiff about her weekend.

24. Approximately one week later, Plaintiff was doing a "Rover" shift where Plaintiff was required to walk the perimeter of the outdoor areas of BCCF.

25. During Plaintiff's aforementioned "Rover" shift, an inmate, who had a close relationship with Leopardi and Kubek, yelled to Plaintiff that Kubek wanted to speak with her.

26. Thereafter, Kubek cornered Plaintiff in front of the same aforementioned inmate and Leopardi and began to raise his voice as he spoke to Plaintiff. Kubek specifically yelled at Plaintiff that she could never tell anyone at work about his wife, where she works, or that she is Asian.

27. Notably, Plaintiff had not told anyone about her interaction with Kubek's wife except Leopardi.

28. The aforementioned hostility and degradation is just another form of increased animosity that Plaintiff was subjected to after she refused to engage in sexual advances or conversation with Leopardi and Kubek.

29. Further, Plaintiff believes and avers that Kubek thought he could speak to Plaintiff in such a hostile and degrading way because she was a female (as Plaintiff did not see Kubek converse with males in the same manner).

30. Shortly after the aforesaid interaction with Kubek, Plaintiff was moved from the block she had previously been working on and did not work on that side of the correctional facility for approximately one month.

31. Plaintiff did not receive an explanation as to why she was no longer assigned to the previous block.

32. Plaintiff was removed from the block for a few weeks before she found that she had been separated from her previous block due to an allegation from an inmate about Plaintiff (discussed *infra*).

33. In or about the beginning of November 2024, Investigator Anthony DiSandro (male, hereinafter "DiSandro"), who was employed by Defendant, called Plaintiff into his office.

34. Upon entering DiSandro's office, he began the meeting by directly asking Plaintiff: "do you wax your p*ssy?" – upon which Plaintiff was disturbed, embarrassed, and unsure of how to answer the question.

35. DiSandro continued the conversation by informing Plaintiff that an inmate, from the block from which Plaintiff had been removed, allegedly complained about Plaintiff and there was a rumor spreading across BCCF regarding this complaint.

36. Specifically, DiSandro informed Plaintiff that the aforementioned inmate alleged that Plaintiff had discussed her grooming habits, i.e. whether she shaved or waxed her private region, with the inmate in a "sexual nature." The inmate alleged that Plaintiff told him that "[she] get[s] her p*ssy waxed at Kubek's wife's nail salon."

37. Plaintiff adamantly protested this allegation saying that the allegation was completely fabricated and informing DiSandro he should investigate it to reveal the truth.

38. Unprompted, during their meeting, DiSandro asked Plaintiff if she had any issues with Leopardi and Kubek – as if he were looking for a motive as to why this inmate would say such a thing if untrue.

39. Plaintiff informed DiSandro that she did have a contentious relationship with Leopardi and Kubek.

40. Plaintiff knew the inmate who complained about her was an inmate closely associated with Leopardi and Kubek.

41. By way of example(s) only: (a) Plaintiff witnessed the aforementioned inmate doing tasks for Leopardi and Kubek on many occasions; (b) all officers on the block were unallowed to lock this inmate into his cell – as ordered by Leopardi and Kubek; and (c) Leopardi and Kubek shared this inmate's commissary items with him.

42. DiSandro informed Plaintiff that this allegation against her would be taken care of with Human Resources ("HR") and "not to worry about it" which Plaintiff understood to mean that the allegation would be removed from her file because the complaint was obviously fabricated.

43. However, the fallout of the aforementioned rumor was damaging to Plaintiff's reputation and her mental health. The degrading comments made to Plaintiff and about Plaintiff were nothing short of hostile and discriminatory.

44. On many occasions, other officers at BCCF ridiculed Plaintiff about the aforementioned rumor. Specifically, male officers approached Plaintiff and asked her more degrading questions about her grooming habits and subjected her to sexual harassment.

45. Plaintiff did not hear anything further about the investigation into the inmate's complaint about her – believing that DiSandro was handling the situation with HR as he had informed Plaintiff he would do.

46. After months of being harassed, bullied, and degraded by Leopardi and Kubek as well as other officers and sergeants – Plaintiff was still afraid to complain about Leopardi and Kubek's behavior for fear of further retaliation and hostility.

47. Additionally, Plaintiff did not feel she could safely meet with DiSandro after he put her in a substantially uncomfortable situation regarding his direct and crude questioning of her grooming habits.

48. In or about December 2024, Plaintiff received her first performance evaluation from Wylie. Wylie informed Plaintiff that everything about her job performance was satisfactory except that her overall evaluation resulted in an "unsatisfactory" because Plaintiff's file contained the allegation of having a sexual conversation with an inmate.

49. Plaintiff informed Wylie that she had already spoken to DiSandro about this and that the allegation was blatantly untrue. Wylie responded by informing Plaintiff to go to HR.

50. Thereafter, Plaintiff met with Diane Otto from HR (female, hereinafter "Otto") and to Plaintiff's surprise, DiSandro was present in the meeting.

51. During the aforementioned meeting, Plaintiff explained her experiences with Leopardi and Kubek, including the aforesaid sexual harassment and hostile work environment.

52. Plaintiff informed Otto that she believed the fabricated complaint from the inmate was orchestrated by Leopardi and Kubek.

53. Plaintiff explained to Otto that Leopardi was consistently trying to get near Plaintiff, subjecting her to sexually harassing comments, and went so far as to try to friend her on Facebook twice – as Plaintiff rejected his first request.

54. Otto informed Plaintiff that there was already an open investigation into Leopardi for sexual misconduct with another employee of Defendant.

55. Otto further told Plaintiff that Defendant would investigate Plaintiff's claims into Leopardi and Kubek and that it would be "taken care of."

56. In or about the end of December 2024, Plaintiff moved to overnight shifts. Although Plaintiff was not stationed at the block where Leopardi and Kubek typically were – they still found ways to sexually harass and retaliate against her.

57. Specifically, by way of example, Leopardi – who almost never worked overnight shifts – began to work overnight shifts at the same time as Plaintiff.

58. At the same time, Leopardi was informing other officers at BCCF that Plaintiff was trying to get him fired.

59. Leopardi was also still sexually harassing Plaintiff and would purposefully sit next to her during meetings even though Plaintiff made it clear that she did not want to interact with him.

60. Defendant did not do anything to protect Plaintiff from Leopardi or Kubek during their alleged "investigation" into her aforesaid sexual harassment complaints.

61. Instead, Plaintiff received notification from HR that the case against Leopardi was closed and that Plaintiff would not find out the results of the investigation.

62. Plaintiff never heard anything regarding Defendant's alleged investigation into Kubek's behavior.

63. Leopardi's behavior did not change in the months that followed, and Plaintiff was still required to work with Leopardi and Kubek despite her complaints to HR regarding their sexual and discriminatory misconduct.

64. From in or about January of 2025 until Plaintiff's wrongful termination in June of 2025, Plaintiff received increased scrutiny from sergeants at BCCF.

65. By way of example only, Plaintiff was called to a sergeant's office on one occasion because someone had allegedly complained that Plaintiff's nails violated BCCF's dress code. However, Plaintiff's nails at the time were not fake, cut short, and painted light blue to match BCCF's uniforms.

66. After Plaintiff's meeting about her nails, she confided in another female officer whose nails were acrylic, long, and rainbow colored. This female officer was not reprimanded for her nails. Upon information and belief, the female officer had not complained of sexual harassment, unlike Plaintiff.

67. In fact, upon information and belief, other female officers who were not reprimanded were known to be complacent in or engaging in the sexual harassment advances from male officers.

68. By way of another example only, BCCF's dress code required the hair of officers to be worn up. Plaintiff started to receive complaints from sergeants during roll calls, **after months of wearing her hair the same way**, that her hair "was too long in her ponytail."

69. Plaintiff obtained a doctor's note that allowed her to continue wearing her hair as she had been due to migraines (a reasonable accommodation for a disability under the ADA).

70. Before her complaints of sexual harassment, however, Plaintiff had not received any complaints or heard any concerns regarding her appearance at work.

71. Other female officers (who did not complain of sexual harassment and/or were complicit with that sexual harassment occurring within Defendant) had long colorful nails and wore their hair long yet did not receive the same kind of scrutiny (or any scrutiny) as she did.

72. Plaintiff felt singled-out and targeted due to her prior complaints of sexual harassment.

73. On or about April 1, 2025, Plaintiff received her second performance evaluation from Wylie.

74. In Plaintiff's second performance evaluation, there was no mention of any dress code violations, as she received a "satisfactory" mark in that category. Instead, the only complaint was regarding Plaintiff's attendance.

75. The only 2 (two) categories on Plaintiff's sheet that were marked "unsatisfactory" opposed to "satisfactory" were the Attendance and Work Quality – only indicating Plaintiff's allowed use of personal sick time (under the Attendance category) and one missed forced overtime shift (under the Work Quality category).

76. Over the course of Plaintiff's employment with Defendant, she was unable to complete only 2 (two) forced overtime shifts due to illness on the first occasion and because of safety reasons on the second occasion.

77. In or about the week of June 9, 2025, Plaintiff received a Loudermill Hearing for the allegations of her leaving 2 (two) forced overtime shifts.

78. The normal procedure for the entirety of Plaintiff's employment with Defendant at BCCF was that if an employee misses 4 (four) overtime shifts, you receive a non-disciplinary warning. Then, if things progressed, the employee would receive a Loudermill Hearing and be

placed on Level 1-3 (one to three) supervision. If things did not resolve after the Level 1-3 supervision, then termination would occur.

79. To put it simply, Plaintiff should not have had a Loudermill Hearing because she had only missed 2 (two) overtime shifts. This obvious enhanced scrutiny of Plaintiff was brought up by her Union Representative during the Loudermill Hearing.

80. Plaintiff's Union Representative used male comparators, including those on their probation period, who never received a Loudermill Hearing yet had a much worse attendance record than Plaintiff.

81. Shortly following Plaintiff's aforesaid Loudermill Hearing, she was subjected to even more hostility and animosity when on or about June 15, 2025, Plaintiff was told by Sergeant Ronald Grouse ("hereinafter "Grouse") that her shoes were not allowed (even though Plaintiff's shoes had not been an issue up and through this point of her employment).

82. Plaintiff tried to explain that she needed to wear shoes, as opposed to boots, to accommodate her disability (a reasonable accommodation under the ADA).

83. Plaintiff suffers from regional pain syndrome in her knee and shin splints from the Army (disabilities under the ADA).

84. Plaintiff received an e-mail from Grouse later that day after her completed shift informing her to fill out forms for accommodations for her aforementioned disability.

85. Plaintiff responded that she would do so and made a doctor's appointment to follow-through on this request. However, the next day Plaintiff was wrongfully terminated.

86. On or about June 16, 2025, Plaintiff completed her shift and was informed she was terminated. The reason given for termination was "unsatisfactory performance during probationary period."

87. Plaintiff's termination was completely false and pretextual, as (1) Plaintiff was terminated shortly after complaining of sexual harassment; (2) after being subjected to discriminatory and retaliatory treatment stemming from the same; (3) immediately after requesting reasonable accommodations; (4) Plaintiff was offered an unsolicited glowing review of her performance at BCCF by way of a Letter of Recommendation from Sargant Shiv Patel (hereinafter "Patel") at BCCF.

88. Based on the foregoing, Plaintiff avers that she was subjected to a hostile work environment and ultimately terminated by Defendant for discriminatory and/or retaliatory reasons under Title VII, the ADA, and state law.

**COUNT I**
**<u>Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")</u>**
**([1] Gender Discrimination/ Sexual Harassment; [2] Retaliation;**
**[3] Hostile Work Environment)**

89. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

90. Plaintiff was subjected to a discriminatory and retaliatory hostile work environment because of her gender through disparate treatment, sexually harassing comments and advances, discriminatory/retaliatory harassment, and defamation of her character throughout the workplace.

91. Upon information and belief, despite Plaintiff's complaints of the foregoing, Defendant's management never properly investigated or addressed her concerns and the harassment escalated, such that she was subjected to a retaliatory hostile work environment.

92. After being subjected to constant discriminatory/retaliatory harassment (despite her complaints about the same), Plaintiff was disciplined and then ultimately terminated from her employment with Defendant.

93. Plaintiff believes and avers that her gender was a motivating or determinative factor in Defendant's decision to discipline her and terminate her employment.

94. Plaintiff also believes and avers that she was disciplined and ultimately terminated in retaliation for engaging in protected activity under Title VII.

95. Plaintiff asserts that Defendant's unlawful decisions (discussed *supra*) were made in violation of Title VII.

**COUNT II**
**Violations of the Pennsylvania Human Relations Act ("PHRA")**
**([1] Gender Discrimination/ Sexual Harassment; [2] Retaliation;**
**[3] Hostile Work Environment)**

96. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

97. Plaintiff properly exhausted her administrative remedies regarding her PHRA claims because she timely filed a charge of discrimination with the PHRC (by dual filing her claims with the EEOC) and the charge has been pending for at least one year.

98. Plaintiff re-asserts and re-alleges each and every allegation as set forth in Count I of the instant Civil Action Complaint, as such actions constitute identical violations of the Pennsylvania Human Relations Act.

**COUNT III**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Failure to Accommodate;)**

99. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

100. Plaintiff suffers from qualifying health conditions under the ADA which affects her ability (at times) to perform some daily life activities.

101. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, Plaintiff did require reasonable medical accommodations at times.

102. Plaintiff requested reasonable accommodations from Defendant, including but not limited to the ability to wear her hair in a ponytail and the ability to wear specific shoes.

103. Plaintiff was subjected to hostility and animosity due to her health and/or requests for accommodations through demeaning and/or discriminatory treatment towards her (as discussed *supra*).

104. Defendant failed to properly accommodate Plaintiff by punishing Plaintiff for her requested accommodations.

105. Shortly before Plaintiff's termination, she was told to get an accommodation letter so that she could wear certain shoes to work.

106. Plaintiff complied with this request by scheduling a doctor's appointment; however, she was terminated before she could attend this doctor's appointment and submit a medical accommodation note regarding the same.

107. Plaintiff believes and therefore avers that her actual/perceived/record of health conditions were a motivating and/or determinative factor in Defendant's decisions to issue her discipline and/or terminate her employment.

108. Plaintiff also believes and therefore avers that she was disciplined and/or terminated because of her requests for reasonable medical accommodations (which constitutes unlawful retaliation under the ADA).

109. Lastly, Plaintiff believes and avers that Defendant failed to accommodate her disability by reprimanding her for her accommodations and/or terminating her so they would not have to accommodate her disabilities.

110. These actions as aforesaid constitute violations of the ADA.

**COUNT IV**
**<u>Violations of the Pennsylvania Human Relations Act ("PHRA")</u>**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; and [3] Failure to Accommodate)**

111. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

112. Plaintiff has properly exhausted her administrative remedies regarding her PHRA claims by dual filing her Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and by waiting at least one year since the filing before asserting her PHRA claims.

113. Plaintiff re-asserts and re-alleges each and every allegation as set forth in Count III of the instant Civil Action Complaint, as such actions constitute identical violations of the Pennsylvania Human Relations Act.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of discriminating/retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B. Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority.

Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation/discrimination at the hands of Defendant until the date of verdict;

C. Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

D. Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F. Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: ______________________

Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
akarpf@karpf-law.com
(215) 639-0801

Dated: October 8, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Julia Meshel | : | CIVIL ACTION |
| v. | : | |
| County of Bucks | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (x )

| | | |
|---|---|---|
| 10/8/2026 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Defendants place of business

***RELATED CASE IF ANY:*** Case Number:____________________ Judge:______________________________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:____________________

**B.** ***Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):________________
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*______________________________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

MESHEL, JULIA

**(b)** County of Residence of First Listed Plaintiff: Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

**DEFENDANTS**

COUNTY OF BUCKS

County of Residence of First Listed Defendant: Bucks
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
☐ 110 Insurance; ☐ 120 Marine; ☐ 130 Miller Act; ☐ 140 Negotiable Instrument; ☐ 150 Recovery of Overpayment & Enforcement of Judgment; ☐ 151 Medicare Act; ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans); ☐ 153 Recovery of Overpayment of Veteran's Benefits; ☐ 160 Stockholders' Suits; ☐ 190 Other Contract; ☐ 195 Contract Product Liability; ☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation; ☐ 220 Foreclosure; ☐ 230 Rent Lease & Ejectment; ☐ 240 Torts to Land; ☐ 245 Tort Product Liability; ☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY: ☐ 310 Airplane; ☐ 315 Airplane Product Liability; ☐ 320 Assault, Libel & Slander; ☐ 330 Federal Employers' Liability; ☐ 340 Marine; ☐ 345 Marine Product Liability; ☐ 350 Motor Vehicle; ☐ 355 Motor Vehicle Product Liability; ☐ 360 Other Personal Injury; ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY: ☐ 365 Personal Injury - Product Liability; ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability; ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY: ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights; ☐ 441 Voting; ☐ 442 Employment; ☐ 443 Housing/ Accommodations; ☒ 445 Amer. w/Disabilities - mployment; ☐ 446 Amer. w/Disabilities - Other; ☐ 448 Education

**PRISONER PETITIONS**
Habeas Corpus: ☐ 463 Alien Detainee; ☐ 510 Motions to Vacate Sentence; ☐ 530 General; ☐ 535 Death Penalty
Other: ☐ 540 Mandamus & Other; ☐ 550 Civil Rights; ☐ 555 Prison Condition; ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881; ☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act; ☐ 720 Labor/Management Relations; ☐ 740 Railway Labor Act; ☐ 751 Family and Medical Leave Act; ☐ 790 Other Labor Litigation; ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application; ☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158; ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights; ☐ 830 Patent; ☐ 835 Patent - Abbreviated New Drug Application; ☐ 840 Trademark; ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff); ☐ 862 Black Lung (923); ☐ 863 DIWC/DIWW (405(g)); ☐ 864 SSID Title XVI; ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant); ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act; ☐ 376 Qui Tam (31 USC 3729(a)); ☐ 400 State Reapportionment; ☐ 410 Antitrust; ☐ 430 Banks and Banking; ☐ 450 Commerce; ☐ 460 Deportation; ☐ 470 Racketeer Influenced and Corrupt Organizations; ☐ 480 Consumer Credit (15 USC 1681 or 1692); ☐ 485 Telephone Consumer Protection Act; ☐ 490 Cable/Sat TV; ☐ 850 Securities/Commodities/ Exchange; ☐ 890 Other Statutory Actions; ☐ 891 Agricultural Acts; ☐ 893 Environmental Matters; ☐ 895 Freedom of Information Act; ☐ 896 Arbitration; ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision; ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding; ☐ 2 Removed from State Court; ☐ 3 Remanded from Appellate Court; ☐ 4 Reinstated or Reopened; ☐ 5 Transferred from Another District *(specify)*; ☐ 6 Multidistrict Litigation - Transfer; ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
ADA (42USC12101); Title VII (42USC2000)

Brief description of cause:
Violations of the ADA, Title VII and the PHRA.

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.  **DEMAND $**  CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE ____ DOCKET NUMBER ____

DATE 10/8/2026  SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____